UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| TERESA A. LILLY-POSEY, | ) | Civil Action No.: 4:14-cv-4776-DCN-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security; | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. Section 405(g), to obtain judicial review of a "final decision" of the Commissioner of

Social Security, denying Plaintiff's claim for disability insurance benefits (DIB) and social security

income (SSI). The only issues before the Court are whether the findings of fact are supported by

substantial evidence and whether proper legal standards have been applied.

## I. RELEVANT BACKGROUND

### A.     Procedural History

Plaintiff filed an application for DIB and SSI on April 26, 2011, and July 12, 2011,

respectively, alleging inability to work since September 17, 2008, on both applications. Her claims

were denied initially and upon reconsideration. Thereafter, Plaintiff filed a request for a hearing. A

hearing was held on July 25, 2013, at which time the Plaintiff and a vocational expert (VE) testified.

The Administrative Law Judge (ALJ) issued an unfavorable decision on August 23, 2013, finding

that Plaintiff was not disabled within the meaning of the Act. (Tr.17-38). Plaintiff filed a request for

review of the ALJ's decision, which the Appeals Council denied on October 20, 2014, making the

ALJ's decision the Commissioner's final decision. (Tr. 5-10). Plaintiff filed this action on December 18, 2014.

**B.    Plaintiff's Background and Medical History**

**1.    Introductory Facts**

Plaintiff was born on October 30, 1959, and was 48 years old at the time of the alleged onset. (Tr. 131). Plaintiff completed her education through two years of college and has past relevant work experience as a sales manager, a final operations operator, an assistant manager of Big Lots and owner of a family daycare.  (Tr. 254).  Plaintiff alleges disability due to multilevel neural foraminal stenosis, facet arthropathy, disc protrusion, neck pain, back pain, carpal tunnel syndrome, right upper extremity pain and weakness, fibromyalgia, headaches, diabetes, obstructive sleep apnea, obesity, depression, anxiety, and somatization disorder. (Tr. 339-42).

**2.    Medical Records and Opinions**

Although the ALJ found that Plaintiff suffers from several severe and non-severe impairments, only the medical records relevant to this recommendation are set forth below.

**a.    Mental Impairments**

On November 19, 2008, Plaintiff began care with Marc Brickman, D.O., F.A.C.P. (Tr. 535). On April 24, 2009, she reported "alot of stress, regarding work."[1] (Tr. 547). On April 8, 2010, she reported that she was sad because her grandson passed away, but she was "staying very active and thinking about going back to school." (Tr. 557). On May 21, 2010, Plaintiff reported confusion from her Cymbalta, but Dr. Brickman stated that Plaintiff drove herself to the appointment and acted appropriately. (Tr. 563). His exam revealed normal cognition, albeit with some slowness, but she

_____

[1]Plaintiff's alleged onset date is September 17, 2008.

was nevertheless answering questions "ok." (Tr. 563).

On July 8, 2010, Plaintiff reported that her Klonopin helped her anxiety, but she was very upset and "thinking about going on disability." (Tr. 569). Dr. Brickman's exam on that date showed that Plaintiff was depressed, but her cognition remained normal. (Tr. 569). On November 8, 2010, and December 14, 2010, Plaintiff reported what she believed to be recent anxiety attacks, but her cognition at the exam was normal. (Tr. 572, 575).

In 2011, Plaintiff began care with John H. DeWitt, M.D. On March 8, 2011, Plaintiff reported that she experienced "spells," in which she allegedly became non-communicative and less alert. (Tr. 621). Dr. DeWitt's exam revealed that Plaintiff was well-oriented, very talkative, and she gave "exquisite detail about her medical history." (Tr. 622). Dr. DeWitt stated that Plaintiff's insight and judgment were limited, but she did not have paranoid ideations and was not psychotic, confused, demented, or suicidal. (Tr. 623). Dr. DeWitt diagnosed Plaintiff with somatization disorder, rule out depression, rule out generalized anxiety disorder, and mixed personality disorder. Her GAF score was 40. She was told to continue on Klonopin and Cymbalta. (Tr. 621-623).

On March 30, 2011, Plaintiff was not doing very well. She was agitated and short of breath. She was prescribed Seroquel (Tr. 620). On April 18, 2011, Plaintiff still had significant pain and sleep problems (Tr. 619).

On May 17, 2011, Dr. DeWitt's exam demonstrated that Plaintiff was distracted with fragmented thoughts, impaired memory, and inadequate comprehension. (Tr. 618). She did very poorly on serial 7 subtractions and could only recall 2 of 5 numbers forwards, and 1 of 5 backwards. She seemed to be very slowed mentally and her comprehension was not adequate. (Tr. 618).

On June 15, 2011, Dr. DeWitt stated that Plaintiff was "talkative today, articulate, and did

-3-

not appear to be confused." (Tr. 617). Her medications were keeping her "relatively stable," and although she was anxious, she was not suicidal, hopeless, or negative (Tr. 617).  She was not hopeless or negative, but was very anxious and concerned about her physical symptoms. (Tr. 617).

On July 8, 2011, Plaintiff was "anxious, upset, worried, and depressed," but she was not acutely suicidal. (Tr. 616). She "continue[d] to have tremendous difficulty with multiple physical symptoms to include pain and other disabilities."  Dr. DeWitt added a new medication, Vibryd, to her other medications of Cymbalta and Klonopin (Tr. 616).

On August 2, 2011, Dr. DeWitt stated that Plaintiff was "slightly better" than at her previous appointment. (Tr. 744). She was still "very impaired," but had more energy and her thoughts were better organized. (Tr. 744).  Dr. DeWitt indicated that Plaintiff had severe depression. Her thought process was slowed and distractible. Her thought content was obsessive. Her mood/affect was depressed. She had poor attention and concentration and poor memory. She had a very serious work-related limitation in function due to her mental condition. She was confused, forgetful, and not able to think clearly enough to make good decisions due to severe depression. (Tr. 624).

On October 4, 2011, Plaintiff was "somewhat more emotionally stable;" she was not "as labile or upset or anxious." (Tr. 746). On December 19, 2011, Dr. DeWitt stated that Plaintiff was not acutely in distress, hopeless, or suicidal, but she continued to be hyper-focused on her physical concerns and complaints. (Tr. 747). On February 7, 2012, Plaintiff had ongoing struggles with chronic pain and physical limitations, which caused ongoing depression. She had fleeting suicidal thoughts. (Tr. 748).  Her medications were reportedly keeping her condition under control, albeit "barely." (Tr. 748).  On March 29, 2012, she reported that she was "not doing well at all." (Tr. 749). She had low self-esteem, was depressed, and in pain. She was very somatically occupied. (Tr. 749).

-4-

On May 8, 2012, she reported that she was "doing better" after a new medication, Deplin, was added. (Tr. 750). She was "less tearful, less depressing, coping better, and overall functioning well." (Tr. 750).

On June 20, 2012, Dr. DeWitt observed that Plaintiff had a problem with jumping from topic to topic and had some thought disorganization, but she seemed stable, was thinking rationally, and was not acutely agitated, upset, or tearful; she demonstrated a "fairly positive attitude." However, she reported that her pain was severe. (Tr. 953). Dr. DeWitt made no changes to her medication. (Tr. 953). On August 22, 2012, Plaintiff presented very upset because her step-brother passed away, but Dr. DeWitt found that Plaintiff was "doing relatively well" on her medications and was not in need of inpatient psychiatric treatment. (Tr. 954).

By April 12, 2013, she was doing better – "less emotional, less overwhelmed, dealing better with the pain." (Tr. 955). Dr. DeWitt's exam revealed that Plaintiff was "moderately depressed," but her speech was fluent with appropriate syntax and content; thought process was organized with no loosening of associations or psychosis; judgment/insight were better; memory was unimpaired; concentration was good; and fund of knowledge was excellent. (Tr. 955).

On April 25, 2013, Plaintiff reported that her brother was recently killed. (Tr. 956). Dr. DeWitt noted "Speech is slowed. She is overwhelmed. Thought process is disjointed. She is not psychotic. Judgment and insight are impaired." (Tr. 955-56). On May 23, 2013, Plaintiff was still mourning the death of her brother and continued to be very focused on her medical problems. She was upset and tearful. She was constantly anxious and depressed. She walked very slowly and her speech was slowed. Her concentration was slightly decreased and her judgment and insight were mildly impaired. She was not able to function because of severe chronic pain, physical disabilities,

as well as significant depressive psychopathology. (Tr. 957).

On August 2, 2011, Dr. DeWitt completed a one-page questionnaire, indicating that Plaintiff had a slow and distractible thought process, obsessive thought content, depressed mood, poor concentration, and poor memory. (Tr. 624). He opined that Plaintiff would not be able to make good decisions and had very serious work-related functional limitations. (Tr. 624).

On December 14, 2011, Stephanie B. Boyd, Ph.D, of Harbison Psychological Services, LLC, conducted a mental status evaluation at the state disability agency's request. Plaintiff reported eight-out-of-ten depression, but denied suicidal thoughts and reported that she has never been admitted to a psychiatric hospital. (Tr. 697). Dr. Boyd observed that Plaintiff was "somewhat distractible and tangential," but she was "responsive to redirection." (Tr. 698). The exam revealed that Plaintiff was fully oriented with "some difficulty with maintaining attention and concentration." Her GAF score was 50.  (Tr. 698). Dr. Boyd concluded that Plaintiff "demonstrated cognitive interference with her attention and concentration span" and "has the ability to manage at least simple, repetitive tasks related to her concentration, attention, and intellectual level, but is likely to experience medical and psychiatric symptoms that may compromise her abilities." (Tr. 697-98).

On January 5, 2012, upon review of Plaintiff's records, Michael Neboschick, Ph.D., completed a Psychiatric Review Technique assessment. Dr. Neboschick concluded that Plaintiff had mild daily living activity restrictions; moderate social functioning difficulties; and moderate concentration, persistence, or pace difficulties. (Tr. 126). Dr. Neboschick found that Plaintiff would work best performing routine, repetitive tasks in uncrowded settings with limited interaction. (Tr. 126). Dr. Neboschick also conducted a RFC assessment and concluded that Plaintiff was moderately limited in the categories of concentration and persistence, social interaction, and adaptation. (Tr.

127-28).

On February 20, 2012, Lynn Rutland-Addy, LPC, of Southern Counseling Associates, wrote a one-page letter, indicating that she has treated Plaintiff since May 2011. She noted that Plaintiff has suffered from numerous medical conditions during the last three to four years that have decreased her ability to function appropriately which in turn have resulted in depressed mood, irritability, and lack of interest in socializations. . . . Symptoms of anxiety presented have been excessive worry over occupational and social environments, restlessness, and reported sleep disturbances." (Tr. 736). Rutland-Addy opined that Plaintiff "is mentally unable to perform tasks to her former abilities." (Tr. 736). On December 17, 2012, and July 9, 2013, Ms. Rutland-Addy submitted similar letters, stating that Plaintiff had depressed mood, loss of energy, flat affect, insomnia, feelings of worthlessness, and decreased ability to participate in pleasurable activities. She exhibited irritability and poor concentration. The psychological effects that had presented due to her medical condition greatly reduced her ability to function at an adequate level and exacerbated her distress levels remarkably. (Tr. 846, 924).

On July 3, 2012, Samuel Goots, M.D., completed Psychiatric Review Technique and RFC assessments. Like Dr. Neboschick, Dr. Goots concluded that Plaintiff had mild daily living activity restrictions; moderate social functioning difficulties; and moderate concentration, persistence, or pace difficulties. (Tr. 143-44). Dr. Goots concluded in his RFC assessment that Plaintiff was moderately limited in the categories of concentration and persistence, social interaction, and adaptation. (Tr. 147-48).

### b.    Back Impairments

On November 17, 2008, two months after her alleged disability onset date, Plaintiff reported

to Women's Health Associates that she engaged in an "active lifestyle." (Tr. 489). For the next two and a half years, the records do not reflect treatment or complaints of back pain. On May 11, 2011, Plaintiff reported to Reddiah Babu Mummaneni, M.D., of Aiken Neurosciences, PC, that she was experiencing difficulty moving her right side, hand and leg tingling, and neck and lower back pain. (Tr. 517, 518, 519). Dr. Mummaneni's motor exam demonstrated 5/5 strength throughout, except very slightly reduced strength in her right flexor finger and her "[r]ight lower extremity demonstrates some give away weakness occasionally but in general[] she has normal strength in both lower extremities." (Tr. 517). Further, Dr. Mummaneni found that Plaintiff "was able to walk normally." (Tr. 517). Dr. Mummaneni ordered lumbar and cervical spine MRIs. (Tr. 517). Dr. Mummaneni strongly felt that she had somatoform disorder. (Tr. 517).

On June 24, 2011, Michelle Lyon, M.D., of Carolina Musculoskeletal Institute, PA, examined Plaintiff. Plaintiff demonstrated 5/5 strength throughout, normal tone, and an unremarkable gait. (Tr. 629). Dr. Lyon ordered no testing. (Tr. 628). Dr. Lyon suggested that Plaintiff discuss her psychogenic spells of right-sided weakness further with her psychologist. (Tr. 627-28).

On August 4, 2011, Edwin V. Martinez de Andino, M.D., a rheumatologist with Carolina Musculoskeletal, examined Plaintiff. Plaintiff complained of "generalized pain on the low back, intermittently radiating to the right lower extremity," but Dr. Andino's exam showed no joint or muscle asymmetry, no atrophy, and 5/5 motor strength in all extremities. (Tr. 634-35). Plaintiff exhibited "significant guarding," but demonstrated "full passive range of motion of all joints." (Tr. 635). The straight leg-raising test was normal; Plaintiff had normal range of motion of her hips, shoulders, and elbows; and her hands and feet were "completely normal." (Tr. 635). Dr. Martinez

de Andino believed that her symptoms were mostly psychogenic, although she had obvious deconditioning. He did not feel she had fibromyalgia. (Tr. 634-636).

A lumbar-spine MRI conducted on August 10, 2011, was unremarkable with the exception of annular tears at L3-L4, mild disc desiccation from L2-3 to L3-4, and degenerative facet arthropathy at L5-S1. (Tr. 630-31). A cervical spine MRI on the same date was also unremarkable with the exception of neural foraminal stenosis and encroachment on the left lateral recess and neural foramen at C2-3. (Tr. 632-33).

On November 8, 2011, Thomas McCullough, M.D., of Aiken Internal Medicine Associates, P.A., conducted a musculoskeletal exam and found that Plaintiff demonstrated normal bulk and tone, as well as 5/5 strength in her upper and lower extremities. (Tr. 758). He diagnosed Plaintiff with six different conditions; a back impairment was not on the list, nor did he recommend any type of treatment for her alleged back condition. (Tr. 759). He wrote that he had genuine concerns for Plaintiff's mental state. He was not sure that she had a good grasp of what was actually going on with her health (Tr. 759).

On February 21, 2012, Plaintiff returned to see Dr. Lyon. Plaintiff stated that she had "no use of her right arm," but Dr. Lyon observed that Plaintiff moves "the RUE [right upper extremity] naturally in conversation, and puts all her weight on her RUE to shift positions on the exam table." (Tr. 295). Dr. Lyon determined that Plaintiff had moderate right carpal tunnel syndrome, but no evidence of cervical radiculopathy or brachial plexopathy. (Tr. 295).

On May 9, 2012, Plaintiff complained to Dr. McCullough about her back pain. (Tr. 752). She was teary-eyed, clammy, nauseated, and had abdominal pain. She was walking with a cane. (Tr. 752). Dr. McCullough described the back pain as "nonspecific" and referred Plaintiff to other

-9-

physicians for treatment (Tr. 752).

On May 15, 2012, Plaintiff saw Ty W. Carter, M.D., of Carolina Musculoskeletal, regarding her back pain, which she stated has "recently gotten worse." (Tr. 774). Dr. Carter found that Plaintiff had "a little bit of difficulty rising from a sitting to standing position," decreased leg reflexes, and decreased right-leg strength, but good right-leg sensation. (Tr. 774). Dr. Carter scheduled Plaintiff for an epidural injection and nerve conduction test. (Tr. 774).

On May 29, 2012, Plaintiff saw Russell K. Daniel, M.D., of Carolina Musculoskeletal. Dr. Daniel stated that, despite Plaintiff's thorough work-up and complaints that her back issue has "inhibit[ed] her in almost every aspect of life," "no one has found the exact cause for her weakness and pain." (Tr. 776). Dr. Daniel gave Plaintiff an injection at L3-4 (Tr. 775), but deferred further examination "[i]n light of the patient's extensive diagnostic work up thus far and repetitive examinations." (Tr. 776).

On June 5, 2012, Dr. Carter found that Plaintiff's cervical spine CT scan showed some "minor bulging, but again, nothing major from a stenosis standpoint." (Tr. 777). Likewise, the EMG was within normal limits. (Tr. 777). Plaintiff did not want any more injections because she experienced "some facial flushing." (Tr. 777). Dr. Carter concluded, "There is really nothing further I can add. I do not feel the patient needs any surgical intervention . . . She has plenty of medicines to take for now." (Tr. 777).

On June 13, 2012, Plaintiff saw William E. Durrett, M.D., of Aiken Neurosciences. Dr. Durrett found that Plaintiff had positive straight leg-raising tests and decreased sensation. (Tr. 782). He ordered a lumbar-spine MRI. (Tr. 782). The MRI was unremarkable: "The paraspinal soft tissues are unremarkable. Marrow signal is normal throughout the lumbar spine. There is anatomic

-10-

alignment. The spinal cord terminates at the L1 level. There is very minimal desiccation of some of the lumbar disks. No focal disk disease is identified. There is no compromise of the spinal canal or neural foramen." (Tr. 787). She was diagnosed with chronic, worsened lumbar degenerative disc disease with radiculopathy. (Tr. 781-782).

On June 19, 2012, Dr. Daniel stated that Plaintiff "has had a multitude of testing done and the exact source of her pain has been difficult to elucidate." (Tr. 779). Dr. Daniel was "not exactly certain the source of her pain" (Tr. 779).

On May 20, 2012, state agency medical consultant, Robert Kukla, M.D., conducted a RFC assessment. Upon reviewing Plaintiff's medical records, Dr. Kukla concluded that Plaintiff could occasionally lift/carry fifty pounds, frequently lift/carry twenty-five pounds, and stand/walk about six hours and sit more than six hours in an eight-hour workday. (Tr. 145-46). Dr. Kukla found that Plaintiff had unlimited pushing/pulling abilities (including operation of hand and foot controls) and no manipulative limitations, but was limited to occasional climbing of ladders/ropes/scaffolds and frequent climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling. (Tr. 145-46).

On July 13, 2012, Plaintiff reported to Dr. Durrett with severe right and left SI pain and posterior hip pain. (Tr. 788). On November 13, 2012, she received an SI injection. (Tr. 863).

On July 23, 2013, Dr. McCullough, an internal medicine doctor, completed a one-page, check-box disability questionnaire. (Tr. 985). He checked boxes indicating that Plaintiff would not be able to engage in more than part-time work, her pain precluded her from performing gainful activity for an entire day, her condition "substantially limit[ed]" her ability to sit throughout the day, and her condition limited her ability to stand and walk for more than a few hours per day. (Tr. 985).

Dr. McCullough left the "additional comments" portion of the form blank. (Tr. 985).

On July 24, 2013, Dr. McCullough completed another form wherein he opined that Plaintiff could sit for only one hour during an eight-hour workday, stand/walk zero hours at a time, and would need to shift positions "as often as every 5 minutes." (Tr. 988). He opined that Plaintiff could occasionally lift/carry up to twenty pounds. (Tr. 988). He further opined that Plaintiff could never stoop, crouch, twist, or climb. (Tr. 988). The form asked Dr. McCullough to "list the objective evidence supporting the opinion provided on this form." (Tr. 989). He responded that Plaintiff has "significant back pain and limited mobility" (Tr. 989).

**C.     The Administrative Proceedings**

    **1.     The Administrative Hearing**

        **a.     Plaintiff's Testimony**

Plaintiff testified that she was 53 years old. She was 5'4" and weighed 230 pounds. She was right-handed. She had six children, who were all adults. She lived in a triple-wide mobile home. Her husband worked during the day. Plaintiff had a driver's license and drove three to six times a month depending on how many doctor's appointments she had. Her husband drove her to the hearing. She testified that she could read and write, but she could not pay bills even if she had an income because they overwhelmed her. She had not worked since September of 2008. (Tr. 66-69).

Plaintiff testified that she had been diagnosed, and took medication for, depression and anxiety. She said she was hurting a little bit and was fidgety. She saw a counselor three times a month, and it helped her. She had anxiety attacks that were brought on by stressful situations. She had three or four panic attacks a week. She took her medications and put her head in the freezer for the cold air and tried to clear her mind. She did not know how long the attacks lasted. Physical

-12-

limitations and turmoil also caused her panic attacks. (Tr. 69-71).

In a typical day, Plaintiff woke up, went to the restroom, and fed her dog and let the dog out. She drank a cup of coffee and ran the dishwasher. She wiped the counter-tops and pulled the bedspread and sheets up. When she got tired or could not breathe, she sat down. There was only one chair in the living room that she could sit in. She used the toaster oven to make dinner because she could not get things in and out of the regular oven. (Tr. 88-89).

Plaintiff testified that she had a very bad memory, she was nervous, and she did not like to be in stressful situations. She would get stressed when she had to make decisions. She had regular crying spells, which was why she saw a counselor and took antidepressants. The medications helped a little. Plaintiff felt that her depression and anxiety would prevent her from working. (Tr. 89-95).

Plaintiff testified that her day was spent doing some activities, but she spent half her day sitting and half her day moving around the house trying to find things that she could do. The attorney noted that Plaintiff's doctors had written that she had a somatoform disorder. Plaintiff stated that she did not show emotion, and she was embarrassed when she cried. She had been told it was not proper to show emotion. She testified that she was very nervous and a very private person, but her pain was real. (Tr. 95-98).

### b.     Vocational Evidence

The VE classified Plaintiff's past work as that of sales clerk, daycare worker, assistant manager in retail, branch manager of a financial business, manager and owner of a daycare, and collections clerk. (Tr. 107). The ALJ proposed the following hypothetical:

> Assume an individual of the claimant's age, education and past job experience. The individual is limited to medium work with frequent climbing of ramps and stairs, occasional climbing of ladders, ropes, and scaffolds, frequent balancing, stooping,

-13-

kneeling, crouching or crawling. The individual would be limited to occupations requiring no more than simple, routine, repetitive tasks not performed in a fast-paced production environment, involving only simple, work-related instructions and decisions and relatively few workplace changes. The individual is limited to occupations requiring no more than occasional interaction with co-workers and members of the general public.

(Tr. 107-108).

The VE testified that the hypothetical individual could not perform Plaintiff's past relevant work. Other work the individual could perform was packer/hand packager, medium, SVP of 2, unskilled, DOT number 920.587-018, with 24,000 jobs regionally and 880,000 jobs nationally; kitchen helper/dishwasher, medium, SVP of 2, unskilled, DOT of 318.687-010, 22,000 regionally and 1.8 million nationally; and warehouse worker/stocker, medium SVP of 2, unskilled, DOT of 922.687-058, with 2,400 jobs regionally and 2.2 jobs nationally (Tr. 108-109).

The ALJ proposed a second hypothetical:

Assume the same individual as the first hypothetical, limited to light work with frequent climbing of ramps and stairs; no climbing of ladders, ropes or scaffolds; frequent balancing; occasional stooping; no kneeling, crouching or crawling. The individual is also limited to occupations requiring no more than simple, routine, repetitive tasks not performed in a fast-paced production environment, involving only simple, work-related instructions and decisions and relatively few workplace changes. The individual would be limited to occupations requiring no more than occasional interaction with co-workers and members of the general public.

(Tr. 109-10).   The VE testified that the individual could perform work as a garment sorter, light, SVP of 2, unskilled, DOT of 222.687-014, with 600 jobs regionally and 54,000 jobs nationally; small product assembler II, light, SVP of 2, unskilled, DOT of 739.687-030, with 3,900 jobs regionally and 275,000 jobs nationally; mail clerk, mail sorter, or mail collector, light, SVP of 2, unskilled, DOT of 209.687-026, with 720 jobs regionally, and 117,000 jobs nationally (Tr. 109-110).

-14-

The ALJ proposed a third hypothetical:

Assume an individual that is limited to sedentary work and due to symptomology, the hypothetical individual would be off-task 20 percent of the workday.

(Tr. 111). The VE testified that there would be no work for that individual.

The attorney asked the VE about an individual that had three to four episodes a week where they would be off task and away from the workstation at unpredictable intervals for a period of up to 30 minutes. In other words, the individual would have unpredictable intervals on a nearly daily basis of being off-task. The VE stated that there would be no work for the individual. The VE also stated that the vast majority of jobs required the individual to perform a combination of sitting and standing for 8 hours a day.

The attorney asked the VE if the individual could sit 5 to 10 minutes at a time, stand with a cane for 5 to 20 minutes at a time and walk short distances before she would need to stop, could the individual do competitive work activity. The VE stated that the description fell within the context of sit/stand option, but the frenetic pace of sit/stand and walk as described would be detrimental to a person being able to effectively and accurately engage in the necessary work at hand. The attorney noted that even with a sit/stand option the individual would have to maintain a pace or stay on task, and the frequency of position change as stated would interfere with that. The VE stated that individual that are hired to perform entry-level, unskilled work are hired to be on task and to produce and to perform. (Tr. 111-112).

The attorney asked the VE if even unskilled work required an individual to maintain attention and concentration on the task for at least two-hour intervals during the day. The VE stated that if a person was off task just five percent of the workday, it was virtually unacceptable and would not be

accommodated or even tolerated. The VE also testified that an individual that missed more than a

day to a day-and-a-half of work each month would not be able to work. The VE indicated that his

testimony was consistent with the DOT. (Tr. 112-114).

**2.    The ALJ's Decision**

In the decision of August 22, 2013, the ALJ made the following findings of fact and

conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.

2.    The claimant has not engaged in substantial gainful activity since September 17, 2008, the alleged onset date (20 CFR 404.1571 et seq. and 416.971 et seq.).

3.    The claimant has the following severe impairments: Depression; Anxiety; Status-Post Stenting of the Pancreatic Duct Secondary to Mass Stricture; Pancreatitis; Degenerative Disc Disease of the Lumbar Spine; Degenerative Disc Disease of the Cervical Spine; Coronary Artery Disease; and a Somatoform Disorder (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant's conditions of Hypertension, Diabetes, Status-Post Hernia Repair, Obesity, Hypothyroidism, Gastroesophageal Reflux Disorder (GERD), and a Right Carpal Tunnel Syndrome are non-severe impairments under the Act and Regulations (20 CFR 404.1520(c) and 416.920(c)).

5.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with additional limitations. The claimant can frequently climb ramps and stairs. The claimant can do work that does not require the climbing of ladders, ropes, or scaffolds. The claimant can frequently balance. The claimant can occasionally stoop. The claimant can do work that does not require kneeling, crouching, or crawling. The claimant can do work that requires no more than simple, routine, repetitive tasks. The

claimant can do work that is not performed in a fast-paced production environment. The claimant can do work that involves only simple and work-related instructions and decisions and relatively few workplace changes. The claimant can also do work in jobs that require no more than occasional interaction with co-workers and members of the general public.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on October 30, 1959, and was 48 years old, which is defined as an individual closely approaching advanced age, on the alleged disability date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416969(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from September 17, 2008, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-38).

## II. DISCUSSION

The Plaintiff argues that the ALJ erred in his decision, and that reversal and remand are appropriate in this case. Specifically, Plaintiff raises the following issues in his brief, quoted verbatim:

I.     The ALJ did not perform the analysis of the treating and evaluating physician opinions required by 20 CFR § 404.1527(d)(1)-(6), SSR 96-2p and SSR 96-5p.

-17-

II.     The ALJ failed to properly evaluate the credibility of the Plaintiff.

(Plaintiff's brief).

The Commissioner argues that the ALJ's decision is supported by substantial evidence.

## A.     LEGAL FRAMEWORK

### 1.     The Commissioner's Determination–of–Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as: the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months. 42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. See, e.g., Heckler v. Campbell, 461 U.S. 458, 460, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity ("SGA"); (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from

_____

[2]The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant

performing PRW;[3] and (5) whether the impairment prevents him from doing SGA. See 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. See 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d) (5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir.2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform

---

must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; Sullivan v. Zebley, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); see Bowen v. Yuckert, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3]In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

other work. Hall v. Harris, 658 F.2d 260, 264–65 (4th Cir.1981); see generally Bowen v. Yuckert, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [ ] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. See id.; Richardson v. Perales, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); Walls, 296 F.3d at 290 (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." Vitek v. Finch, 438 F.2d 1157, 1157–58 (4th Cir.1971); see Pyles v. Bowen, 849 F.2d 846, 848 (4th Cir.1988) (citing Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir.1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390, 401; Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir.2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. See Vitek, 438 F.2d at 1157–58; see also Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir.1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.1972).

B.     **ANALYSIS**

1.     **Treating Physician**

a.     **Dr. John DeWitt**

Plaintiff argues that the ALJ erred in weighing the opinion of Plaintiff's treating psychiatrist, Dr. DeWitt, which he afforded only moderate weight, while giving the opinion of the one-time consulting examiner great weight, and the opinions of the non-examining, state psychological consultants significant weight.   The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). Generally, more weight is given to the opinions of examining physicians than nonexamining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1508 and § 404.1527(c)(2). The medical opinion of a treating physician is entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 404.1527(c)(2), SSR 96-2p, and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2 31, 35 (4th Cir. 1992)).

In determining what weight to give the opinions of medical sources, the ALJ must apply all of the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the

claimant; whether the source has a treatment relationship with the claimant and, if so, the length of

the relationship and the frequency of examination; the nature and extent of the treatment

relationship; the supportability and consistency of the source's opinion with respect to all of the

evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p;

Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).

Plaintiff argues that the ALJ erred in affording Dr. DeWitt's opinion only moderate weight.

The ALJ discussed Dr. DeWitt's opinion as follows:

> On August 2, 2011, Dr. DeWitt concluded that the claimant's mental condition was
> very serious, she was confused and forgetful, and she was unable to think clearly
> enough to make good decisions secondary to severe depression (Exhibit 9F).
>
> The undersigned gives moderate weight to these medical source statements, as the
> record is consistent with the conclusion that the claimant maintained an additional
> portion of [her] functionality.  The undersigned notes that these medical source
> statement are [sic] not consistent with the treating physician's own conclusions on
> the same date as these medical source statements, wherein Dr. DeWitt concluded that
> she experienced no problems with loose associations or psychotic symptomology
> (Exhibit 20F/1).  Furthermore, the undersigned notes that the record includes
> evidence of fluid speech with no dysarthria, a fund of knowledge that was four of
> four regarding immediate recall and two of four during delayed recall, being not as
> overwhelmed, having some more energy, better organized thoughts, the ability to
> read and follow instruction, the ability to name specific items and describe their
> function, thinking about things rationally, not being acutely agitated, upset, or tearful,
> and no delusional thoughts (Exhibits 2F/14-16; 8F/6; 15F/1-2; 16F; 20F/1; 21F/7-9;
> and 37F/1-3).  Additionally, the consultative examiner's opinion that she retained the
> ability to understand and carry out simple instructions is also consistent with the
> conclusion that she retained an additional portion of her functionality (Exhibit 16F).
> Therefore, the undersigned gives moderate weight to these medical source
> statements.

(Tr. 31-32).

Plaintiff first challenges the ALJ's finding that Dr. DeWitt's opinion was inconsistent with

his own treatment notes from the same day.  Dr. DeWitt opined on August 2, 2011, that Plaintiff had

-22-

a very serious work-related limitation in function due to her mental condition, adding that "Pt. is confused, forgetful, and not able to think clearly enough to make good decisions [secondary to] severe depression." (Tr. 624). The ALJ stated that this opinion was "not consistent with the treating physician's own conclusions on the same date as these medical source statements, wherein Dr. DeWitt concluded that she experienced no problems with loose associations or psychotic symptomology (Exhibit 20F/1)." However, Dr. DeWitt's progress note for August 2, 2011, cited by the ALJ, does not make mention of loose associations or psychotic symptomology. Rather, Dr. Dewitt noted that Plaintiff "is slightly better than she was on July 8[th4] which was about three weeks ago. . . . She seems to have some more energy and her thoughts are better organized. She is not as overwhelmed. She is still very impaired." (Tr. 744). Given the ALJ's misstatement that Dr. DeWitt concluded on August 2, 2011, that Plaintiff "experienced no problems with loose associations or psychotic symptomology," his reliance on this alleged inconsistency was in error.[5] Further, even though Dr. DeWitt's progress note for August 2, 2011, did provide that Plaintiff was doing slightly better with more energy, better organized thoughts, and less overwhelmed, he nevertheless noted that

---

[4]On July 8, 2011, Plaintiff was "anxious, upset, worried, and depressed," but she was not acutely suicidal. She "continue[d] to have tremendous difficulty with multiple physical symptoms to include pain and other disabilities." (Tr. 616).

[5]It appears that the ALJ may have gotten this language from Dr. DeWitt's April 12, 2013, progress note. (Tr. 955). Nevertheless, Plaintiff notes in her brief that

> Psychotic symptomatology refers to symptoms such as hallucinations and delusions, which are unrelated to DeWitt's diagnosis of depression with confusion and forgetfulness. Likewise, loose associations are common thinking disturbances in schizophrenia, characterized by rapid shifts from one topic of conversation to another. The ALJ fails to explain how an absence of symptoms of schizophrenia are contradictory to his diagnosis of severe depression which affects her concentration and memory.

(Pl. Brief 26-27).

-23-

she was still very impaired, a fact the ALJ omitted during his recitation of the medical records.  (Tr.

28).

However, this was not the only reason cited by the ALJ for giving Dr. Dewitt's opinion only

moderate weight.  He also stated that

> the record includes evidence of fluid speech with no dysarthria, a fund of knowledge
> that was four of four regarding immediate recall and two of four during delayed
> recall, being not as overwhelmed, having some more energy, better organized
> thoughts, the ability to read and follow instruction, the ability to name specific items
> and describe their function, thinking about things rationally, not being acutely
> agitated, upset, or tearful, and no delusional thoughts (Exhibits 2F/14-16; 8F/6;
> 15F/1-2; 16F; 20F/1; 21F/7-9; and 37F/1-3).

(Tr. 32).[6]  Plaintiff argues a review of these cited treatment notes leaves the ALJ's decision lacking

an adequate explanation for his finding that Dr. DeWitt's opinion deserved only moderate weight.

First, Exhibit 2F (Tr. 393-416), in which the ALJ finds the report that Plaintiff's speech was "fluid

with no dysarthria," relates to Plaintiff's seizures, not her mental health.  (Tr. 407).  Exhibit 15F (Tr.

688-95) includes Plaintiff's treatment records from her cardiologist.  Exhibit 21F (Tr. 751-72)

includes Plaintiff's treatment records from Dr. McCullough.  In the specific records cited by the ALJ,

Exhibit 21F/7-9 (Tr. 757-59), Dr. McCullough states that Plaintiff "talks in very abstract terms.  She

does have some flight of ideas.  She is difficult to keep focused.  She is not overly depressed.  There

is no pressured speech.  Her affect is relatively normal."  (Tr. 759).  Dr. McCullough also states "I

have some very genuine concerns for Mrs. Posey and her mental state.  I am not sure that she has a

good grasp of what is actually going on with her health wise.  She does see a psychiatrist.  She

_____

[6]The ALJ cites to this same set of records four other times in his decision to support
giving great weight to the opinion the consultative examiner, little weight to the opinion of
Plaintiff's Licensed Professional Counselor, significant weight to the opinions of the state
psychological consultants, and in assessing Plaintiff's credibility.  (Tr. 32, 34, 35).

probably warrants a discussion with him about what exactly is going on." (Tr. 759). Thus, this record actually supports Dr. DeWitt's opinion that Plaintiff is "confused, forgetful, and not able to think clearly enough to make good decisions." (Tr. 624).

The remaining records cited by the ALJ to support his decision giving only moderate weight to Dr. DeWitt's opinion include the report of the consultative examiner, Dr. Boyd (Exhibit 16F (Tr. 696-700)), in which Dr. Boyd states that Plaintiff could "read and follow the instruction 'close your eyes' and followed a three-stage command. She was able to name specific items (i.e. pen, watch) and describe their function." (Tr. 698). The ALJ also cites other progress notes from Dr. DeWitt from June 20, 2012, August 22, 2012, and April 12, 2013. (Exhibit 37F (Tr. 953-59)). On June 22, 2012, Dr. DeWitt notes that, although Plaintiff appeared stable and able to think rationally, "she still has a problem with jumping from topic to topic and having some thought disorganization." (Tr. 953). On August 22, 2012, he noted that Plaintiff was "very upset, tearful, and depressed." (Tr. 954). On April 12, 2013, Dr. DeWitt noted that Plaintiff was "better than she had been . . . less emotional, less overwhelmed" but was "still not where she need[ed] to be." (Tr. 955). Although Dr. DeWitt noted that, on that day, Plaintiff's judgment and insight were better and her attention and concentration are good, during her next appointment on April 25, 2013, Dr. DeWitt noted "Speech is slowed. She is overwhelmed. Thought process is disjointed. She is not psychotic. Judgment and insight are impaired." (Tr. 955-56). During Plaintiff's next appointment with Dr. Dewitt, on May 23, 2013, Dr. DeWitt noted: "she is very negative and hopeless in her outlook on the world. . . . Her concentration is slightly decreased. . . . Judgment and insight are slightly impaired. She basically right now is not able to function because of severe chronic pain, physical disabilities, as well as significant depressive psychopathology." (Tr. 957). The ALJ also fails to consider the GAF scores

-25-

of 40 and 50 given by Dr. DeWitt and Dr. Boyd, respectively.[7]  (Tr. 621-623, 698).

The majority of the medical records upon which the ALJ relies are either irrelevant or only tangentially relevant to her mental health or actually support Dr. DeWitt's opinion.  At the least, they are not inconsistent with his opinion.  Although it appears Plaintiff had a good day on April 12, 2013, when Dr. DeWitt noted that she was better than she had been, less emotional, less overwhelmed, with better judgment and insight and good attention and concentration, even then Dr. DeWitt opined that she was "still not where she need[ed] to be."  (Tr. 955).  Further, the next two appointments reveal that Plaintiff was again having difficulties with attention, concentration, judgment and insight.  (Tr. 956-57).  The ALJ is obligated to consider all evidence, not just that which is helpful to his decision.  Gordon v. Schweiker, 725 F.2d 231 (4th Cir. 1984), Murphy v. Bowen, 810 F2d. 433 (4th Cir. 1987).  The ALJ must explicitly indicate the weight given to all relevant evidence.  Gordon, 725 F.2d at 235-236 (4th Cir. 1984), Maxey v. Califano, 598 F.2d 874 (4th Cir. 1979).  It appears the ALJ failed to consider all relevant evidence and relied only upon the few records that purportedly supported his finding that Dr. DeWitt's opinion was entitled only moderate weight.

Finally, in determining that Dr. DeWitt's opinion was entitled only to moderate weight, the ALJ stated that "the consultative examiner's opinion that [Plaintiff] retained the ability to understand and carry out simple instructions is also consistent with the conclusion that she retained an additional

---

[7]A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  A GAF score of 31–40 indicates "some impairment in reality testing and communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood."  Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).

portion of her functionality (Exhibit 16F)." (Tr. 32).  However, Dr. Boyd qualified that finding and the ALJ neglects to consider the opinion in its entirety, which provides that "it is anticipated that [Plaintiff] has the ability to manage at least simple, repetitive tasks related to her concentration, attention, and intellectual level, but is likely to experience medical and psychiatric symptoms that may compromise her abilities."  (Tr. 699).

In determining what weight to give the opinions of medical sources, the ALJ must apply all of the factors in 20 C.F.R. § 404.1527(c)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p; Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006).  In his determination that Dr. DeWitt's opinion was entitled to moderate weight, it is not clear whether the ALJ considered Dr. DeWitt's role as Plaintiff's treating psychiatrist, whom she had seen approximately fifteen times for thirty minutes each between March of 2011 and May of 2013,  (Tr. 616-24, 744-50, 953-57) or that he was a specialist in Psychiatry.

As set forth above, more weight is generally given to the opinions of treating physicians than non-treating physicians because treating physicians are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1508 and § 404.1527(c)(2).  The ALJ gave the greatest weight to the opinion of the non-treating, non-evaluating state agency psychologists, while giving only moderate weight to the opinion of Plaintiff's treating psychiatrist. Although the ALJ found that the opinion of Dr. DeWitt was inconsistent with the other

-27-

evidence in the record, the ALJ does not clearly identify or explain the other evidence with which it is inconsistent.

In sum, the ALJ did not conduct a proper analysis of the treating physician's opinion. Accordingly, the undersigned recommends that reversal and remand are necessary to allow the fact finder to evaluate the opinions of the physicians under the regulatory standards set forth in § 404.1527(c). To the extent that deference is not provided to the opinions of the treating physician, the ALJ must evaluate the opinions under the § 1527(c) standards and articulate good reasons for rejecting the treating physician's opinions. Proper application of the treating physician rule may have a significant impact on the Commissioner's determination of severe impairments, credibility and the RFC and on the availability of work to Plaintiff in the national economy at Step Five.

### b.    Dr. Thomas McCullough, M.D.

Plaintiff also argues that the ALJ erred in weighing the opinion of her treating physician, Dr. Thomas McCullough, M.D.  The ALJ discussed Dr. McCullough's opinion as follows:

> On July 23, 2013, Dr. Thomas McCullough, a physician, completed a form that was entitled disability questionnaire.  Dr. McCullough concluded the claimant would not be able to engage in more than part-time work, should likely experience incapacitating pain during several times of the month to the extend that she would precluded [sic] from performing gainful activity for an entire workday during several times of the month, would be substantially limited regarding his [sic] ability to sit throughout the workday, and would be limited regarding her ability to stand or walk for no more than a few hours during a day (Exhibit 40F/3).  On July 29, 2013, Dr. McCullough completed a form that was entitled "Physical Capacities Evaluation Form."  Dr. McCullough concluded that the claimant could sit for one hour during an eight-hour workday, stand or walk for zero hours during an eight-hour work day, and occasionally lift from one to 20 pounds (Exhibit 41F).

> The undersigned gives little weight to these opinions, as they are not supported by MRI findings of the claimant's lumbar or cervical spine or clinical signs that include no tenderness to the back and a full range of motion (Exhibits 10F; 22F; and 39F). Therefore, the undersigned gives little weight to these medical opinions.

(Tr. 33). However, the ALJ fails to consider Plaintiff's lumbar spine MRI, which revealed focal annular tears bilaterally at the L3-L4 level and degenerative facet arthropathy bilaterally at L5-S1, with disc dessication evident from L2-3 through L5-S1. The cervical spine MRI revealed multilevel neural foraminal stenosis due to uncovertebral joint hypertrophy and encroachment on the left lateral recess and neural foramen at the level of C2-C3 due to disc osteophyte complex. (Tr. 630-633). Although the ALJ sets forth these findings in the hearing decision (Tr. 28), he does not discuss them in conjunction with Dr. McCullough's opinion and explain why this objective evidence fails to support Dr. McCullough's opinion. Thus, upon remand, the Commissioner should also take into consideration Plaintiff's allegations of error with respect to the weight given to Dr. McCullough's opinion.

### 2.    Credibility

Plaintiff also asserts that the ALJ failed to properly evaluate her credibility. The ALJ must make a credibility determination based upon all the evidence in the record. Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir.1985). It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

individual's statements and the reasons for that weight. This documentation is necessary in order to give the individual a full and fair review of his or her claim, and in order to ensure a well-reasoned determination or decision. SSR 96–7p.

Under Craig v. Chater, 76 F.3d 585, 591–96 (4th Cir.1996), subjective complaints are evaluated in two steps. First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Not until such underlying impairment is deemed established does the fact finder proceed to the second step: consideration of the entire record, including objective and subjective evidence, to assess the credibility of the severity of the subjective complaints. See also 20 C.F.R. § 404.1529(b); Social Security Ruling (SSR) 96–7p.

The ALJ may choose to reject a claimant's testimony regarding his pain or physical condition, but he must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. Hatcher v. Sec'y, Dep't of Health & Human Servs., 898 F.2d 21, 23 (4th Cir.1989) ( quoting Smith v. Schweiker, 719 F.2d 723, 725 n. 2 (4th Cir.1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96–7p.

Plaintiff argues that the ALJ's finding of a lack of objective medical evidence to support Plaintiff's credibility with respect to her back impairment is inconsistent with his finding that

Plaintiff suffers from the severe impairment of somatoform disorder.[8] The ALJ does not discuss how the somatoform disorder could affect his decision with respect to Plaintiff's credibility. Furthermore, because the undersigned recommends that this case be remanded for proper evaluation of her treating psychiatrist's and physician's opinions, it is possible that this evaluation could affect his findings with respect to Plaintiff's credibility. Therefore, remand is appropriate.

## III. CONCLUSION

In conclusion, it may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented. Pursuant to the power of the Court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in social security actions under sentence four of Sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. Sections 405(g) and 1338(c)(3), it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be REMANDED to the Commissioner for further administrative action as set forth above.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 29, 2016
Florence, South Carolina

---

[8]Somatoform disorders are "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Pt. 404, Subpt. P, App. 1. "Somatoform pain disorder is pain that is severe enough to disrupt a person's everyday life. The pain is like that of a physical disorder, but no physical cause is found. The pain is thought to be due to psychological problems. The pain that people with this disorder feel is real. It is not created or faked on purpose (malingering)." http://www.nlm.nih.gov/medlineplus/ency/article/000922.htm

-31-